HOMEDIRECT, INC.

        Plaintiff,

                     v.

H.E.P. DIRECT, INC.

        Defendant.

No. 10 C 812
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

This is the second order to address Plaintiff's motion for sanctions [Docket Entry # 40].

On December 14, 2012, an evidentiary hearing was held on the motion. On January 22, 2013, I

issued a preliminary order in which I found that, based on testimony from the December 14th

hearing, sanctions were called for in this case. I also scheduled a second evidentiary hearing to

hear mitigation evidence and oral argument as to the specific sanctions that should apply. On

February 19, 2013, the second evidentiary hearing was held. This opinion addresses all of my

findings as well as the remedy that will issue on Plaintiff's motion for sanctions.

    A.     Background

Plaintiff HomeDirect, ("Home") Inc. delivers consumer products to homes. Defendant

H.E.P. ("HEP") Direct Inc. is a competitor. Home is headquartered in Hillside, Illinois and HEP

is headquartered in High Point, North Carolina. Both companies do "in-home, white glove, big

box furniture delivery."

Home alleges that HEP uses unfair trade practices to compete with Home, namely, by

making defamatory statements about Home. This is the second such lawsuit in this court. The

first was settled (08 C 4167). The complaint in this case was filed on February 5, 2010.

The specific allegations here concern Home's attempt in the latter half of 2009 to represent Tealan, a furniture producer, "in connection with the transportation of Tealan's furniture products to customers." In mid-December 2009, Tealan signed on with Home for transportation and logistics services. On January 10, 2010, Maury Mussa, Home's VP of Sales, had a conversation with Tealan's owner, Ame Gur. It is alleged that Gur told Mussa that, despite their agreement, Tealan would not do business with Home. Gur's explanation was that he had heard several negative things about Home's business from an HEP employee. The complaint specifies the HEP employee's statements as the following:

1. "HomeDirect has been trying to sell the company for 6 years and not 1 buyer has turned up."

2. "Home Direct is having financial difficulties."

3. "HomeDirect is buying freight by ridiculously lowering its rates which is a sign that they're about to go out of business."

4. "HomeDirect doesn't pay claims."

All of these claims are alleged to be "false, disparaging and unsubstantiated" and made either with knowledge that they were false or with reckless disregard for whether they were false. This was done "maliciously, with intent to harm and to interfere with HomeDirect's relationship with its prospective client in an effort to poach clients for the [speaker's] new employer."[1] These statements, it is alleged, did cause damage to Home and will cause further damage if repeated.

The claims for relief invoke five theories of tort: deceptive trade practices, unfair competition, defamation, interference with contract, and interference with prospective economic advantage.

---

[1] The person identified as the speaker was once employed by Home and, at the time of the claimed statements, was employed by HEP.

In its Answer, HEP denies the key allegations, some on the basis of its lack of knowledge of the truth or falsity of the allegations and some on the basis of knowledge of the untruth of a particular allegation, i.e. that Gur made the critical statements to Mussa and that an HEP employee made critical statements about Home.

B.  The Motion for Sanctions

Before Home filed this suit, HEP had done business with Tealan. Tealan owed HEP $3,516 for deliveries made by HEP in 2009. In September 2009, HEP's counsel faxed a demand letter to Tealan concerning the overdue payment. About a week later Keith Hewitt, CEO of HEP, exchanged emails with Gur. Hewitt threatened to sue Tealan for the funds owed.[2] On January 11, 2010, there was another email exchange between Hewitt and Gur over proposals to pay Tealan's outstanding bill. No deal was made and HEP did not sue Tealan. Collection efforts did not occur after January 11 nor did any further negotiations.[3]

On February 5, 2010, Home filed the instant suit against HEP. On February 23, 2010, Hewitt wrote to Gur to say that he had been out of the country due to a family emergency and that he had "dropped the ball on this."  He then added: "I am back and if still opportunity [*sic*] to discuss your proposal then I am open to it. Please advise." Gur wrote back: "I did not hear from you and thought you have no interest in it."

---

[2] The back history of Tealan and HEP included a year of services provided by HEP to Tealan for which it billed $43,887. $3,516 was left unpaid. After Johnson's September 24, 2009 threat to sue, Gur and Hewitt had a correspondence beginning on September 25, 2009. Gur wrote that he had been living overseas for the past year. He stated that Tealan had no assets in the US and was basically reduced to having a PO Box. Tealan was suspended as a California corporation in 2009 for failure to pay dues. Despite this, Gur offered to pay HEP $150 a month out of "friendly obligation." Gur never made a single payment.
[3] Tealan (suspended as it was) wanted HEP to handle three containers of goods and Gur proposed that the costs would be paid one-half on a COD basis and the other half on credit terms. The revenue to Tealan/Gur from his product deliveries would allow Tealan to make payments on the existing debt. HEP's CFO and COO thought that this was not a good idea. The matter went nowhere for a while because sometime after January 11, Hewitt's father became ill and died. Talks did not begin again until February 23.

Near the end of March Hewitt wrote to Gur that if he did not "hear from you by next Tuesday, April 6th then I will immediately move forward with filing a suit against Tealan." Hewitt did not follow through on his announced intent to file suit. Hewitt says that he wanted to contact Gur to ask about the alleged defamatory statements in the Home lawsuit, but Gur was not responding so Hewitt brought up the past due bills to get Gur's attention. It apparently worked—the two men began to speak to each other over the phone beginning on March 31 (and ending April 9). At some point, Hewitt says, Gur told Hewitt that he had not heard any defamatory statement about Home from an HEP employee.

Hewitt offered to forgive some of the debt owed by Tealan if Gur would agree to issue a sworn declaration that refuted the allegations in Home's pending complaint. On April 9, Hewitt emailed Gur a draft settlement agreement and a draft declaration refuting Home's allegations. The proposed agreement contained two provisions: (a) HEP would forgive most of Tealan's bills upon payment to HEP of $750.00 (a discount of roughly 79%; and (b) Gur would sign a declaration refuting Home's claims and cooperate in HEP's defense against the Home lawsuit. The draft declaration was written by HEP's lawyer, Robert Johnson.

The lawyer's draft included mention of the outstanding invoices that Tealan owed HEP. The declaration that Gur eventually signed made no mention of the invoices.

The dialogue between Hewitt and Gur did not end with a speedy adoption of the deal. There were more emails from which it is clear there were further conversations between the two men. Hewitt was highly motivated to get an agreement and Gur exploited this need. This is clear from the email correspondence.

On April 16 Hewitt emailed Gur: "Really need to speak with you today please." Gur replied: "I will be back by Sunday," to which Hewitt responded: "I need TODAY for you to

review, sign and email or fax….the documents recently forwarded to you. There is <u>no additional</u> <u>time</u> and Monday is too late." Monday apparently passed without action because on April 19, Gur wrote Hewitt:"I read the agreement drafted and I got some questions." Hewitt answered that day suggesting that he could call Gur or Gur could call him. Hewitt gave Gur two phone numbers, one a cell number, where Gur could reach him. It is fair to infer that there were oral conversations because on April 20, Hewitt emailed Gur to say: "I have adjusted the number in this settlement agreement to $45.00" (a discount of a little more than 98%). I infer that the measure of the discount was part of the discussion between Hewitt and Gur. Still, Gur did not sign the agreement that day. Gur did, however, email Hewitt again: "Its midnight here, I will review the changes tomorrow and if all is good you will see the signed copies." To this Hewitt responded: "I'll be in the office first thing in the AM and need to get this over to the attorney ASAP in order to complete this."

On April 21, Hewitt wrote to Gur stating: "I am behind the 8 ball with this and there is no more time…please provide me with an update as I need to manage this from my side and I am in limbo with you right now." Gur responded by emailing an executed version of the settlement agreement and declaration with an instruction to Hewitt: "Check them out. The amount is $15."

The declaration that Gur signed states, among other things, that "My communications with Mr. Hewitt involved only a current business update on HEP and possibly reinstating Tealan's agreement with HEP….Mr. Hewitt never said anything to me about HomeDirect, positive or negative, at any time." These misleading statements were included to deceive Home and/or a court or jury into a belief that the Gur declaration was not bargained for and acquired only after an extraordinary concession by Hewitt, and therefore was credible.

On the same day the declaration was in hand, Robert Johnson sent it to Home's counsel and, for good measure, also sent it to the law firm's managing partner. In his letter sent along with the declaration, Johnson demanded that Plaintiff's counsel dismiss the lawsuit or face Rule 11 sanctions. The settlement agreement was not then disclosed for the obvious reason that it would diminish the power of Gur's declaration.

Home's lawyers responded by sending a litigation hold letter to Gur. Gur's first known move was to email Hewitt a copy of the litigation hold letter along with a note: "I guess these guys want to spend some more money on this . . . [Get] your attorney to advice [*sic*] on the issue." Hewitt forwarded this to Johnson.

Home's lawyers tried and failed to subpoena Gur in California. On August 17, they mailed Gur asking that he accept service of subpoenas and cooperate in supplying documents and testimony. The email was sent because counsel believed Gur was in Israel. Gur did not respond but he did send an email to Hewitt stating: "I suggest you get me some legal advice on how to deal with this." Hewitt forwarded this to Johnson. Gur never responded to Home's lawyers.

On August 26, Johnson actually filed the Gur declaration in this case in order to support HEP's response to Home's motion to strike the HEP affirmative defenses. Johnson was privy to (and in June and July printed out) the various emails between Hewitt and Gur, though not necessarily the phone calls.

C.    The Legal Basis for the Sanction Motions

Federal law criminalizes paying witness fees to anyone other than an expert witness except for standard witness fees, cost of travel and loss of income due to attendance at court. In this case, it is difficult to consider the cancellation of $3,501 of debt to fit into these

circumstances. This case is not brought under the criminal statute—private counsel have no power to do so—but it is cited as a ground for alleging a bad act on the part of HomeDirect and on the part of Robert Johnson.

There are sanctions precedents that concern the settlement of an unrelated case in exchange for a witness's agreement not to testify in another case. *Synergetics v. Hurst,* 2007 WL 2422871 (E.D.Mo. 2007). Bribing a witness is, of course, a sanctionable event. *Ty, Inc. v. Softbelly's Inc.* 353 F.3d 528 (7th Cir. 1973). This is especially true when the witness is very close to being absolutely essential to the opponent's case.[4]

In the federal courts it makes no difference whether the purchased testimony is truthful. See *Holmes v. U.S. Bank,* 2009 WL 1542786 (S.D. Ohio 2009) ("If a person may be sent to prison for offering to pay a witness for truthful testimony, the Court has little doubt that civil sanctions may be imposed for the same conduct.") However, Plaintiff's emphasis on the federal statute as a basis for sanctions is overstated. Whether giving something of value for truthful testimony is a crime or not is not directly relevant here; we sit in a civil case. The issue is whether paying for truthful testimony is a violation of rules of professional conduct applicable to lawyers. HEP and Johnson cite the rule in their home state of California, which bars a member from directly or indirectly paying, or offering to pay or acquiescing in payment of compensation to a witness contingent on the content of the witness' testimony or outcome of the case. *Ca.Prof Conduct* Rule 5-310. HEP and Johnson read this to mean one can compensate a witness for truthful testimony but not for perjury. I don't think that is a correct interpretation. The Rule bars payment contingent on the content of the testimony, truthful or not. In any event, Johnson was allowed to appear in this court only after signing the standard form which requires (a)knowledge

---

[4] The reason I say "very close" is that the person who allegedly spoke to Gur is likely to be an employee of HEP and thus reluctant to testify against his or her employer. This is particularly so if Gur is unavailable to confirm the testimony of this third person. Without Gur, the probability of Home's defeat approaches 100%.

of the professional conduct and standards applicable in this court, and (b)faithful adherence to them.

HEP and Johnson believe that nothing of value was given to Gur. The amount paid here was not very large (when compared to some of the reported cases) but their argument is that the debt was uncollectible because Tealan was a suspended corporation with no assets in this country. But uncollectible does not mean never collectible. The value to Gur was the ability to free himself of debt in the event that he sought credit or a return to business in this country. It is true that Gur denied that HEP employees told him bad things about its business before Gur's HEP debt was reduced. It is clear, however, that Gur refused to sign the declaration until his debt was erased. His approach was to bargain Hewitt down after Hewitt showed his need for Gur's help—this was a transaction at the evidence bazaar. Clearly Gur thought that excusing or eradicating his debt to HEP was something of value and, considering his conduct, so too did Hewitt.

Johnson asserts that Gur's Declaration is true. He testified to his belief that this is so. In doing so he runs afoul of a lawyer's duty to verify.[5] Even if California courts do not sanction lawyers for exchanging something of value for truthful testimony, I doubt that those courts would take, at face value, the assertions of a lawyer that the testimony was, in fact, truthful.

This is why I am confronted with very firm and frequent assertions by Johnson that Gur is truthful. This is quite difficult to accept considering how slippery a witness Gur seems to be. It is also difficult to conclude that Gur is truthful without proof that Mussa is a liar. If ever there was a case that required some attention to demeanor of a witness, it this is one. Frankly, the unwillingness of Gur to speak to a trained lawyer helps only to undermine the certainty of

---

[5] The Court of Appeals recently discussed the duty to verify in *City of Livonia Employees' Retirement System and Local 295/Local 851 v. Boeing Co.*, No. 12-1899, 12-2009, 2013 WL 1197791, at *8 (7th Cir. Mar. 26, 2013).

truthfulness in Johnson's pleadings and his testimony. Gur did not inspire trust in the CFO and COO of HEP. Hewitt himself did not testify that he thought Gur was truthful. He did not trust Gur's quick answer that Home's allegations were not true. Hewitt insisted in having it in writing, and Gur kept extracting higher and higher prices for his signature on a favorable declaration.[6]

Gur was never deposed. Johnson has testified that he cooperated with Home's lawyers and tried to facilitate their contacting and deposing Gur. He told Gur to cooperate and, at one point, the parties agreed to a one hour telephone deposition with Gur in Israel—this occurring about fourteen months after the lawsuit was filed. The attempt was unsuccessful. Johnson did do all the things he claims but all of this foundered on Gur's intransigence. In fact, no depositions were taken for as many seven months after the lawsuit was filed. During this time Johnson was writing sharp letters and threatening sanctions against Home and its lawyers. What he had to back up his threats, so far as I can tell, is Gur's declaration and the absence of corroboration from phone logs that any HEP employee has spoken to Gur about Home.

I find Johnson's conduct difficult to accept. He knew early on that strong letters would not cause Home to go away. He knew Gur could destroy Plaintiff's case with testimony denying the conversation with Mussa, or admitting the conversation but denying that HEP's people made the alleged derogatory statements about Home.[7] Getting all of this down in a sworn deposition

---

[6] Hewitt thought that Gur was "unethical" because of the fact that Gur did not honor his agreement to settle a much larger debt owed to HEP for $750. Even after further reductions, Gur unilaterally reduced the payment to $15. It is possible that someone in Hewitt's position could accept that a person is "truthful" and "unethical" but there is no evidence that Hewitt has characterized Gur as a "truthful person". Of course, Hewitt would be personally motivated to believe Gur on one point—that no one from HEP said bad things about Home to Gur. I assume that Hewitt would (or has, in deposition) said that Gur is truthful but I would give this assertion little weight.
[7] Johnson did recognize this possibility in his testimony at the sanctions hearing;
Q. (Home's Counsel): And sitting here today based on all things you know about Mr. Gur and all the discovery in this case, do you believe it's possible that Mr. Gur lied in his declaration?
A. (Johnson) I believe that substantively his declaration is correct when he says that no one at HEP Direct said anything negative about HomeDirect to him, and also substantively that he did not do business with HomeDirect

9

early on would be something of significant value to HEP, which Johnson, an experienced lawyer, surely knew. As mentioned, there is no evidence that Johnson or Hewitt ever demanded a deposition from Gur, and I think the reason for this is they did not believe Gur was a dependable witness who would consistently tell the truth as he saw it.

I do not believe that Johnson ever believed that Gur was a truthful person, especially after Gur and Hewitt had gone through the opening stages of their negotiations with Gur. Nor do Hewitt's actions convey the slightest belief in Gur's truthfulness. But they still achieved the tactical gain of contaminating Home's key witness. To do so, neither Hewitt nor Johnson needed to have any faith at all in Gur's truthfulness, and neither man did. Johnson made a show of cooperation in assisting Home to secure Gur's deposition. When Johnson did this, he was aware that Gur avoided lawyers as if they were contagions. It took a while to enlist Hewitt in the effort to depose Gur. Hewitt secured Gur's agreement in the spring/summer of 2011. Gur broke his agreement to participate in a one hour telephonic deposition. All this from a man Johnson supposedly believed to be truthful.

---

because anything negative HEP Direct said to him, that I believe is absolutely true.
Q. And what do you believe is potentially false about—you're obviously making a caveat here.
A. Sure. And here's my caveat, and that is, it's possible Mr. Gur made up the whole story. Mr. Mussa went to the Post Office Box and found out that Tealan wasn't a real company who operated ot of a UPS Store. He had tried to call him six or seven times in the 24 hours proceeding. He finally got a hold of Mr. Gur by saying to him, "hey, look, man, your business is a Post Office box, what's going on here" and that's the only reason Mr. Gur called him back. And at that point in time, Mr. Gur could've made stuff up and he could've said something. He never identified that person and we—
Q. Sure.
A.—and we know that now.
Q. And you deposed Mr. Mussa?
A. After the motions for sanctions was filed, the oppositions and everything else, it's part of our documents here today, yes.
Q. And you found him to be a credible witness, correct?
A. I don't know about that.
Q. But you just indicated that it was possible that Mr. Gur had lied about what he had made up to Mr. Mussa, is that right?
A. That is possible yes.

In light of this, Johnson's letter to Plaintiff's counsel stating: "given the declaration of Mr. Gur, it is apparent that your client fabricated the allegations in the complaint," is difficult to accept. These are very strong words from a lawyer, particularly in light of the obvious possibilities that Gur was lying to Home or that Gur was lying to both parties.

D.      The Conduct of HEP and Johnson Is Sanctionable

HEP's conduct is wrongful in that it exchanged a thing of value for a crucial witness's declaration contradicting the prior statements (truthful or not) alleged by HomeDirect in support of its claims against HEP. I note in particular that the conduct of Hewitt, CEO of HEP, demonstrated that his solicitation of this declaration was made out of desperation or near desperation in the face of Home's complaint. The transaction was motivated out of fear of a witness's testimony and not for purposes of resolving an overdue account receivable. Paying a crucial witness for the purpose to ensure they are useless to the opposing party is egregious.

Robert Johnson's conduct did not adhere to the standards for proper conduct of lawyers. His communications to adversaries were threatening to the point of incivility and they were not justified by the circumstances. The threatening nature of the communications is exemplified by a letter sent not solely to counsel of record in this case but to the firm's managing partner. He made a clear accusation of "fabrication" against an opposing party without a reasonable basis to make it. He acquiesced in the excusing of a substantial amount of a witness's debt in exchange for a declaration that contradicted statements that Plaintiff was relying upon as a basis for its claim against HEP, and Johnson knew that the paid-for declaration effectively destroyed Plaintiff's ability to win the lawsuit. Johnson also failed in his duty to form an independent judgment of the credibility of the witness who signed the declaration, which was inexcusable

given what Johnson knew of Gur.  Simply put, I do not credit Johnson's assertion that (until a much later stage of the proceeding) he believed in the truthfulness of the declarant.

In Johnson's defense, I acknowledge that he produced the emails that provide evidence that the declaration was purchased by his client but it is a small mitigation amounting to a decision not to destroy evidence in his client's possession.  I give no weight to Johnson's efforts to obtain a deposition of the very reluctant signer of the declaration.  Given his knowledge of the character of that untrustworthy declarant, Johnson knew these efforts were almost certain to fail.

I have reached these conclusions applying the standard of clear and convincing evidence.

E.  The Sanctions

1.  A principal witness for HomeDirect has been effectively rendered useless to the plaintiff (and useless to HEP as well.)  There are other potential witnesses but these witnesses are likely to be employees of HEP and unlikely to testify for Plaintiff.  HEP suggests that treating the Gur declaration and settlement agreement as competent and admissible evidence of misconduct by HEP would rectify any harm done.  The suggestion is wrong and would be wrong even if these documents were admitted along with an earlier signed declaration given by Gur and confirming all the details that are in HomeDirect's complaint.  The battle between paper declarations and a number of living witnesses from HEP denying ever saying bad things about Home does not give Plaintiff a fair enough chance of prevailing.  Witnesses do become unavailable and some trials do proceed with paper depositions for one side and live testimony for the other out of necessity, say, when a crucial witness dies of a heart attack.  In this case, the key witness, Gur, was effectively removed from the case by the improper actions of the defendant and not by the ordinary events of life.  For this

12

reason, the proper sanction is to declare that the complaint is true and that HEP is

liable for damages. What would remain is the dispute over damages, which, making

appropriate modifications, can be tried on the merits.

2. I revoke the *pro hac vice* admission of Robert Johnson to the bar for purposes of

representing defendant. From the very beginning of the case, i.e. the filing of the

complaint, Johnson has not adhered to the standards applicable to attorneys in

representing clients. He is, moreover, a witness to and a participant in actions which

themselves may be the subject of testimony, among them the creation of the Gur

declaration as evidence of consciousness of liability or wrongdoing.

F.      Conclusion

For the foregoing reasons, Plaintiff's motion for sanctions [40] is GRANTED in part.

Defendant's motion to set a briefing schedule on summary judgment [99] is DENIED as moot.

ENTER:

James B. Zagel
United States District Judge

DATE: April 29, 2013